394 So.2d 455 (1981)
John R. LORNITIS and Michael Lornitis, Appellants,
v.
STATE of Florida, Appellee.
No. TT-4.
District Court of Appeal of Florida, First District.
February 10, 1981.
*456 Martin S. Page of Darby, Peele, Page & Bowdoin, Lake City, for appellants.
Jim Smith, Atty. Gen., and Raymond L. Marky, Asst. Atty. Gen., Tallahassee, for appellee.
ROBERT P. SMITH, Jr., Judge.
John and Michael Lornitis urge that their convictions, John for possession of more than 100 pounds of marijuana with intent to sell or deliver, and Michael for aiding and abetting his brother, were vitiated by the receipt in evidence of incriminating responses improperly elicited from them by deputy sheriff Jones in violation of Miranda v. Arizona, 384 U.S. 436, 474, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694, 723 (1966), and Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). We agree, finding that the brothers' identification of their luggage in the rear of the truck in which they were traveling was incriminating evidence improperly elicited by deputy Jones after the suspects indicated to him their desire not to be interrogated. We reverse the convictions and remand the defendants for a new trial.
Accompanied by brother Michael as his passenger, John Lornitis drove an Illinois-licensed pickup truck with camper top past a Florida agricultural inspection station in Hamilton County without stopping for the required inspection. Section 570.15, Florida Statutes (1979). An inspector pursued the truck, looked in the rear of the cargo area with John's consent, smelled marijuana, arrested John for not having stopped for inspection, and returned the truck and passengers to the station. A later search of the cargo area, by warrant, produced 782 pounds of marijuana which was baled, wrapped in burlap or plastic, and covered by a quilt.
After arresting the suspects and advising them of their Miranda rights, deputy sheriff Jones read aloud and asked each of them to sign an "acknowledgment and waiver of rights" form, stating:
The above statement of my rights has been read and explained to me and I fully understand what my rights are. I am ready and willing to answer questions or to make a statement without first consulting with a lawyer or without having a lawyer present during questioning. In waiving my right to remain silent, I wish to state that no promises or threats have *457 been made to me and no persuasion or coercion has been used against me.
The Lornitis brothers refused to sign the waiver forms. Deputy Jones then instructed each of them to identify any personal belongings in the cargo area of the truck. John Lornitis testified at the suppression hearing that when he asked deputy Jones what would happen to personal belongings not claimed, Jones said they would be "disposed of." John understood that to mean those items would be "throwed away or something." Deputy Jones did not recall making such a statement. Both brothers then pointed out their luggage in the midst of the marijuana bales. When Michael Lornitis pointed out his suitcase, deputy Jones asked him how it had gotten there, and the suspect answered that he did not know. Both Lornitis brothers denied knowledge of how the marijuana bales came to be in the rear of the truck.
Over objection and despite motions for mistrial, the prosecutor was permitted to adduce the incriminating evidence that the Lornitis brothers identified as their own the luggage which was found amidst the marijuana bales in the closed cargo area of the truck, and that Michael Lornitis claimed not to know how his luggage got there. The propriety of the convictions turns on three major issues: (1) By refusing to sign the waiver forms, did the suspects sufficiently indicate a desire not to be questioned? (2) If so, did deputy Jones nevertheless "interrogate" the suspects by instructing them to identify their personal effects in the back of the truck? (3) If so, and if receipt of the evidence was on that account improper, should the convictions nevertheless be affirmed on harmless error principles because of other evidence against these defendants?
Miranda explains how police should govern themselves when questioning suspects in custody:
If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. (Emphasis added, 384 U.S. at 473-74, 86 S.Ct. at 1627-28, 16 L.Ed.2d at 723.)
By refusing to sign the waiver forms, did the suspects indicate "in any manner" to deputy Jones that they desired to remain silent and did not wish to be interrogated, signalling that "interrogation must cease"? Certainly so. A refusal to sign a form such as was tendered here is not in all events a conclusive indication that the suspect wishes to remain silent, North Carolina v. Butler, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979), but in the circumstances of this case the import of the suspects' refusal to sign was that they chose not to be interrogated. In Butler the suspect said, "I will talk with you but I am not signing any form." Here there was no such spoken consent. The words of the waiver form itself, reciting that the signer was "ready and willing to answer questions or to make a statement without first consulting with a lawyer," are cogent evidence of the privilege asserted by the refusal to sign. Moreover, deputy Jones had no doubt about the significance of his suspects' refusal to sign:
Q. Did you understand by [John Lornitis'] refusal to sign the acknowledgment and waiver of rights that he did not wish to be questioned any further?
A. Yes sir.
.....
Q. Each one said no, I am not going to sign this thing?
A. That's correct.
Q. Upon them doing that you wouldn't say okay boys, what do you know about it, would you?
A. No sir.

*458 Q. Because you understand they didn't want to be questioned anymore?
A. Right.
Deputy Jones understood that the Lornitis brothers did not wish to be interrogated. Evidently the deputy did not consider that he "interrogated" the suspects by instructing them to identify any personal belongings in the rear of the truck. He testified:
Q. The defendants did not desire to be questioned any further?
A. Well, I wasn't really questioning, I just asked them about personal effects.
Q. What was [the] purpose of asking?
A. Identifying what was theirs in the rear of the vehicle.
Despite deputy Jones' disclaimer that "I wasn't really questioning," the circumstances persuasively suggest that deputy Jones understood and expected that compliance with his instructions, like responses to conventional interrogation, would produce incriminating evidence. Significantly, deputy Jones did not miss the opportunity of asking Michael Lornitis how his luggage "got there" amidst the marijuana:
[By Jones] [H]e identified his personal items in the rear of the vehicle and stated he didn't know how they got back there.
[By Michael Lornitis] He asked me if the suitcase there was mine, I said yes. Then he asked me how it got there, I told him I didn't know.
Though it may be charitably debated whether deputy Jones knew and intended that his instructions operate as "interrogation" concerning the suspects' knowledge of marijuana bales in the rear of the truck, the deputy's perceptions and intentions are not determinative of the issue. Rhode Island v. Innis, supra, 441 U.S. at 300, 100 S.Ct. at 1689, 64 L.Ed.2d at 307 (1980) established an objective rather than a subjective standard to define when interrogation occurs:
[T]he Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.
While Innis recognizes that the officer's subjective intent may tend to prove the objective effect of his words or actions,[1] the prescribed inquiry is whether the officer should have known that his words or actions were "reasonably likely to elicit incriminating responses." When deputy Jones instructed the Lornitis brothers to identify any personal items in the cargo area, he must be held to have anticipated that, if they complied, the suspects would be admitting ownership of articles which had been placed in the very presence of the hidden marijuana bales, thus belying the suspects' protests that they knew nothing of the marijuana cache. This of course was an incriminating response, recognized as such by the prosecutor's decision to adduce evidence of it; and the response was precisely that which the improper interrogation was calculated to produce.
There was no evidence whatever that deputy Jones' instructions to the suspects was part of a booking or inventory process routinely followed by the sheriff's office; nor, even if that were the case, could the deputy's instructions or questions be equated with "neutral" non-investigative inquiries such as for name, address, date of birth, and marital status, which are permitted in booking and other administrative processes. Compare Williams v. United States, 391 F.2d 221 (5th Cir.1968), cert. den., 393 U.S. 830, *459 89 S.Ct. 97, 21 L.Ed.2d 100 (1968); United States v. Menichino, 497 F.2d 935 (5th Cir.1974); and see, generally, Kamisar, Brewer v. Williams, Massiah, and Miranda: What is Interrogation? When Does It Matter?, 67 Geo.L.J. 1, 7 (1978).
The State argues that the defendants freely and voluntarily complied with the deputy's instruction and thereby waived the right of interrogation-free silence which they had just asserted, and were understood to have asserted, by refusing to sign the waiver form. We reject that view because it exploits the suspects' failure to recognize, for what it was, the subtle form of interrogation to which they were subjected. The suspects conceived, as reasonably they might considering that deputy Jones apparently acquiesced in their refusal to be questioned, either that complying with his instructions had no evidentiary significance or that complying, being administratively necessary (in the opinion of an officer who evidently respected their election not to talk), was for that reason privileged against use as evidence. Michael Lornitis testified:
Q. I think you said you understood your rights, what did you understand about talking? Did you understand anything you said could be used against you?
A. Yes sir.
Q. What did you understand by anything you said?
A. Well, I figured it meant by direct questioning by the deputy.
Q. Did you understand that ... asking you to identify your personal effects would be constituted or would constitute something that could be used against you?
A. No sir, not at all.
The validity of a waiver "depends on it being voluntarily, knowingly, and intelligently made." Franklin v. State, 324 So.2d 187, 189 (Fla. 1st DCA 1975). Without regard for whether the suspects "voluntarily" gave the incriminating response relied on by the State, or instead simply acquiesced in the apparent authority of deputy Jones to instruct them concerning the identification of their belongings, the suspects' response cannot have constituted a knowing and intelligent waiver of their right, already reserved by them moments before, not to be interrogated.
We conclude, therefore, that the identification evidence was the result of improper interrogation and was inadmissible.
Finally, we have considered and rejected the possibility of affirming these convictions on harmless error grounds. We readily assume that the convictions may survive if the constitutional error was in fact harmless,[2] but harmless error cannot be found under the standard stated in Nowlin v. State, 346 So.2d 1020, 1024 (Fla. 1977):
Reviewing courts may not regard constitutional error as harmless if there is a reasonable possibility that the error may have contributed to the accused's conviction or if the error may not be found harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).
We think, as did the prosecutor in preparing the trial testimony of deputy Jones, that there is more than "a reasonable possibility" that Jones' testimony concerning the defendants' luggage identification would and did contribute to their convictions. There was other incriminating evidence: a trace of marijuana found in a paper bag on the floorboard of the passengers' cab, and an operable window between the cab and the cargo area, which however was found closed and curtained from the cargo side. The record also reveals an admission by John Lornitis that he owned the truck; but that admission to both the agricultural inspector and deputy Jones was not adduced before the jury, and the admission to deputy *460 Jones may have been elicited by him during the same flawed interrogation we have discussed. Disregarding the possible effect of the ownership admission by John Lornitis, the admissibility of which may be determined by the trial court on a new and clearer record in light of our holding here, viable hypotheses of innocence survived the State's proof, and the error we have found contributed substantially to the convictions, which therefore are
REVERSED. The cases are REMANDED for a new trial.
SHAW, J., concurs.
BOOTH, J., dissents with opinion.
BOOTH, Judge, dissenting:
I would affirm the judgments of conviction below. The jury correctly viewed the overwhelming evidence of defendants' possession of 15 bales of marijuana and rejected as incredible the defense that defendants were not aware of its existence. The trial court correctly ruled that evidence of defendants' identification of their luggage among the bails of marijuana was not in violation of the right to remain silent.
NOTES
[1] Innis at fn. 7:

This is not to say that the intent of the police is irrelevant, for it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response. In particular, where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect.
[2] If we correctly decided Marshall v. State, 393 So.2d 584 (Fla. 1st DCA 1981), the Florida Supreme Court applies a different rule, reversing "without consideration of the doctrine of harmless error," when the issue is the propriety of comment on the accused's custodial silence instead of the admissibility of his custodial statements elicited in violation of Miranda. Bennett v. State, 316 So.2d 41, 44 (Fla. 1975); Shannon v. State, 335 So.2d 5 (Fla. 1976).